# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

EVICAM INTERNATIONAL, INC.,           §
                                       §
v.                                     §          Civil Action No. 4:16-CV-105
                                       §          Judge Mazzant
ENFORCEMENT VIDEO, LLC d/b/a           §
WATCHGUARD VIDEO                       §
                                       §
                                       §

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Plaintiff Evicam International, Inc.'s Opening Claim Construction Brief (Dkt. #42), Defendant Enforcement Video, LLC d/b/a Watchguard Video's Responsive Claim Construction Brief (Dkt. #43), and Plaintiff's Reply Claim Construction Brief (Dkt. #49). Also before the Court are the parties' August 11, 2016 Joint Claim Construction and Prehearing Statement (Dkt. #66) and the parties' October 4, 2016 Joint Claim Construction Chart (Dkt. #47). The Court held a claim construction hearing on October 14, 2016, to determine the proper construction of the disputed claim terms in United States Patents Nos. 6,211,907 ("the '907 Patent") and 6,950,013 ("the '013 Patent").

The Court issues this Claim Construction Memorandum and Order and hereby incorporates-by-reference the claim construction hearing and transcript as well as the demonstrative slides presented by the parties during the hearing. For the following reasons, the Court provides the constructions set forth below.

## BACKGROUND

Plaintiff brings suit alleging infringement of United States Patents No. 6,211,907 and 6,950,013 (collectively, the "patents-in-suit"). Plaintiff submits: "The patents at issue relate to

an on-board, secure vehicle-mounted surveillance system, like those used by police officers and trucking companies."  (Dkt. #42 at p. 1).

## LEGAL STANDARDS

Claim construction is a matter of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  The purpose of claim construction is to resolve the meanings and technical scope of claim terms.  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  When the parties dispute the scope of a claim term, "it is the court's duty to resolve it."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The Court examines a patent's intrinsic evidence to define the patented invention's scope.  *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Intrinsic evidence includes the claims, the rest of the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1312–13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.  The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms.  *Phillips*, 415 F.3d at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.*  Other claims, asserted and unasserted, can provide additional instruction because "terms are

normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000) ("Claims are not correctly construed to cover what was expressly disclaimed."). This presumption does not arise when the patentee acts as his own lexicographer. *Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'" *Globetrotter Software, Inc. v. Elam Comput. Grp. Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant*

*v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *See, e.g.*, *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("[A] patent applicant may define a term in prosecuting a patent . . ."). The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). When a patentee distinguishes a claimed invention over the prior art, he is "indicating what the claims do not cover" and "by implication surrendering such protection." *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g*, 334 F.3d at 1324. However, the prosecution history must show that the patentee "clearly and unambiguously 'disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance.'" *Middleton Inc. v. Minn. Mining and Mfg. Co. (3M Co.)*, 311 F.3d 1384, 1388 (Fed. Cir. 2002) (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)). Statements will constitute disclaimer of scope only if they are "clear and unmistakable statements of disavowal." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003). "An ambiguous disavowal will not suffice." *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) (internal quotation marks and citation omitted).

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (internal quotation marks and citation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## ANALYSIS

### *Agreed Claim Terms*

The parties have agreed upon the following constructions:

| Term | Agreed Construction |
|---|---|
| "acomplised [sic]" <br><br> ('907 Patent, Claim 21) | "accomplished" |
| "tamer [sic] proof" <br><br> ('013 Patent, Claim 52) | "tamper proof" |
| "far [sic]" <br><br> ('013 Patent, Claim 53) | "for" |
| "display means for displaying said data" <br><br> ('013 Patent, Claims 6, 23, 58) | Structure: "visual display monitor 48 and equivalents" <br><br> Function: "displaying data" |

| "information storage means" ('013 Patent, Claim 53) | Structure: "video tape drive, hard disk drive, CD ROM drive, solid state repository, flash memory, and equivalents" |
|---|---|
| | Function: "storing data transferred from the remote vehicle" |
| "means for down loading said video signal" ('907 Patent, Claim 1) | Structure: "interface 36, transceiver 39, interface 43, and equivalents" |
| | Function: "downloading video signal" |
| "means for generating vehicle information" ('013 Patent, Claims 4, 21) | Structure: "system controller 22, system controller 16, transducers (e.g., 42, 44, 46, 47, and 48), audio recording device 42, motion sensors/detectors 46, and equivalents" |
| | Function: "generating vehicle information" |
| "download" / "downloading" ('907 Patent, Claim 1; '013 Patent, Claims 10, 27) | "transferring from one device to another over a wired or wireless network" |

(Dkt. #37, Exhibit A at p. 1; Dkt. #47, Exhibit A at pp. 3–9).

*Disputed Claim Terms*

**A. "An on board secure vehicle mounted surveillance system"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| plain and ordinary meaning; limiting | Not limiting.[1] |

(Dkt. #37, Exhibit B at p. 1; Dkt. #47, Exhibit A at p. 10). The parties submit that this term appears in Claim 1 of the '907 Patent (Dkt. #37, Exhibit B at p. 1).

---

[1] Defendant previously proposed: "Not limiting and there is no plain and ordinary meaning. Alternatively, if this clause is deemed to be limiting, it is invalid because it fails to comply with 35 U.S.C. §112, first and second paragraph." (Dkt. #37, Exhibit B at p. 1).

### 1. The Parties' Positions

Plaintiff argues the preamble is limiting because it "recites a fundamental characteristic of the invention" and "provides an antecedent basis and context for subsequent limitations." (Dkt. #42 at pp. 3–4). Plaintiff also argues that "[b]ecause the terms 'on board' and 'vehicle mounted' appear throughout the intrinsic record and are easily understood by persons skilled in the art and lay jurors alike, the terms are not indefinite" (Dkt. #42 at p. 5).

Defendant responds that because this preamble term is merely a descriptive name that does not affect the recited structure, the preamble is not limiting (Dkt. #43 at p. 7).

Plaintiff replies by reiterating that the preamble provides antecedent basis and "sets forth a fundamental aspect of the invention" (Dkt. #49 at p. 1).

### 2. Analysis

> In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes[, Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)]. Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *see, e.g.*, *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.").

Claim 1 of the '907 Patent recites:

> **1.** An on board secure *vehicle* mounted surveillance system comprising:
>   a) at least one video camera monitoring the interior and the exterior of *the vehicle* and for generating video signals of an incident proximate *the vehicle*;
>   b) a recording device for capturing and securely storing said video signals having a coded access;
>   c) a code for providing coded access to said recording device;

> d) means for down loading said video signal from said coded access recording device.

'907 Patent at 10:51–61 (emphasis added).

On one hand, even when a preamble provides antecedent basis for a limitation recited in the body of the claim, an accompanying statement of purpose or use is not necessarily limiting. *See TomTom Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) ("That [a] phrase in the preamble . . . provides a necessary structure for [the] claim . . . does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended use of the invention."); *see also Marrin v. Griffin*, 599 F.3d 1290, 1294–95 (Fed. Cir. 2010) ("[T]he mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim.").

On the other hand, the disputed phrase provides additional detail regarding the "vehicle" that is then recited as "the vehicle" in the body of the claim. *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) ("[W]hen the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects."); *see also Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1373 (Fed. Cir. 2014) (emphasis added) ("The phrase 'the image data' clearly derives antecedent basis from the 'image data' that is *defined in greater detail in the preamble* as being 'representative of at least one sequential set of images of a spray plume.'"). Also, the body of the claim recites "securely storing" video signals, which aligns with the preamble's introduction of the word "secure." Further, consistent usage of "on-board" and "vehicle mounted" in the specification, such as in the Title, Abstract, Background of the Invention, and disclosures of preferred embodiments, support finding the

preamble limiting. *See, e.g.*, *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004).

Finally, Defendant argues that finding the preamble limiting would render the limitation in Claim 1(a) superfluous. However, this is far from clear because presumably the interior and exterior of a vehicle, as well as events proximate the vehicle, could be monitored by a nearby camera rather than necessarily an on-board camera.

Based on all of the foregoing, the Court finds that the preamble is **limiting**. No further construction is necessary because the parties have presented no dispute as to construction of the preamble if found limiting.

### B. "vehicle incident recording system"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| limiting: on board secure vehicle mounted surveillance system | Not limiting and there is no plain and ordinary meaning. Alternatively, if this clause is deemed to be limiting, it is invalid because it fails to comply with 35 U.S.C. § 112, first and second paragraph. |

(Dkt. #37, Exhibit B at p. 3; Dkt. #47, Exhibit A at p. 11). The parties submit that this term appears in Claims 1, 18, and 52 of the '013 Patent (Dkt. #37, Exhibit B at p. 1).

### 1. The Parties' Positions

Plaintiff argues that the preambles containing this term are limiting because "they recite structure and provide antecedent basis for the limitations 'said remote vehicle incident recording system' and 'said remote vehicle'" (Dkt. #42 at p. 5). Plaintiff concludes that "[t]he '013 Patent makes clear that the system is vehicle mounted. Thus, [the] Court should reject [Defendant's] indefiniteness argument, construe the phrase as limiting, and adopt [Plaintiff's] proposed construction." (Dkt. #42 at p. 6).

Defendant asserts the preambles are not limiting because the disputed preamble term is merely descriptive and the claim bodies completely set forth the invention (Dkt. #43 at p. 8).

Plaintiff replies that the preamble provides antecedent basis and recites a vehicular system, concluding "the Court should construe the preamble as limiting the claims to 'an on board vehicle mounted surveillance system'" (Dkt. #49 at p. 1).

**2. Analysis**

Legal principles regarding preambles are set forth above regarding the "on board secure vehicle mounted surveillance system" term.

Claim 1 of the '013 Patent, for example, recites:

> **1.** A system for producing an integrated database of data generated from *a remote vehicle incident recording system* comprising:
>
> a) at least one video camera for generating video signals of *the incident* proximate *the vehicle*;
>
> b) a recording device for capturing said video signals as data;
>
> c) an interface permitting input of an authorization code for accessing said data captured by said recording device, the captured data being inaccessible without the authorization code thereby securely maintaining the captured data as evidence of the incident;
>
> d) an information datalink for accessing data captured by said recording device;
>
> e) a transfer device coupled at least indirectly to said information datalink, the transfer device adapted to securely receive data from *said remote vehicle incident recording system*; and,
>
> f) means for generating an integrated, indexed database of data from *said remote vehicle incident recording system* wherein said means is coupled at least indirectly to said transfer device.

'013 Patent at 13:34–55 (emphasis added).

Because "vehicle" and "incident" (as well as "remote vehicle incident recording system") in the preamble provide antecedent basis for "the incident" and "the vehicle" (as well as "said remote vehicle incident recording system") in the body of the claim, the entire phrase "remote vehicle incident recording system" in the preamble is limiting. *See Proveris*, 739 F.3d at 1373

(emphasis added) ("The phrase 'the image data' clearly derives antecedent basis from the 'image data' that is *defined in greater detail in the preamble* as being 'representative of at least one sequential set of images of a spray plume.'"). The prosecution history cited by Defendant does not compel otherwise. *See* Dkt. #42, Exhibit 12 at 11 (EVIC_000636).

By contrast, the phrase "producing an integrated database of data generated" does not provide antecedent basis, and the body of the claim separately recites "generating an integrated, indexed database of data." Claim 18 of the '013 Patent is similar in these regards. The preambles of Claims 1 and 18 of the '013 Patent are therefore limiting but only as to the phrase "remote vehicle incident recording system."

As to the proper construction of "remote vehicle incident recording system," Plaintiff has not demonstrated that this term should be given the same meaning as the "on board secure vehicle mounted surveillance system" in the preamble of Claim 1 of the '907 Patent, which is addressed above. The Court expressly rejects Plaintiff's proposed construction. No further construction is necessary. Finally, because Defendant's indefiniteness arguments are based on Plaintiff's proposed construction, which the Court is rejecting, the Court also expressly rejects Defendant's indefiniteness arguments.

Claim 52 of the '013 Patent recites:

**52.** A device for permanent, secure tamper proof storage of vehicle information from a vehicle incident recording system, the device comprising:
    a) at least one interface for accessing data from *a remote vehicle incident recording system*;
    b) *an information datalink* coupled to the at least one interface *for receiving data* from the remote vehicle incident recording system;
    c) a transfer device coupled at least indirectly to the information datalink, the transfer device adapted to securely *receive data* from the remote vehicle incident recording system and index said data for storage; and
    d) *a secure, tam[p]er proof storage facility*, separate from said transfer device, but in secure communication with said transfer device, *for permanently*

*storing* an indexed database of integrated data transferred from said remote vehicle to said transfer device.

'013 Patent at 16:41–57 (emphasis added).

Unlike in Claims 1 and 18, which are discussed above, the preamble of Claim 52 does not provide antecedent basis for any limitations set forth in the body of the claim. Instead, the body of the claim separately introduces a recording system, an information datalink, data, and permanent storage. Accordingly, the body of Claim 52 recites a complete invention, and the preamble is not "necessary to give life, meaning, and vitality to the claim." *Catalina Mktg.*, 289 F.3d at 808 (internal quotation marks omitted and citation omitted).

Thus, the Court finds that the **preambles of Claims 1 and 18 of the '013 Patent are limiting as to the phrase "remote vehicle incident recording system"** and that the **preamble of Claim 52 of the '013 Patent is not limiting**.

### C. "transceiver"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| a device that transmits and receives wireless signals[2] | plain and ordinary meaning |

(Dkt. #37, Exhibit B at p. 1; Dkt. #42 at p. 7; Dkt. #47, Exhibit A at p. 13). The parties submit that this term appears in Claims 21–22, 24, and 43–44 of the '907 Patent (Dkt. #37, Exhibit B at p. 1).

---

[2] Plaintiff previously proposed: "device that can transmit and receive wireless signals." (Dkt. #37, Exhibit B at p. 1).

### 1. The Parties' Positions

Plaintiff argues that "[i]n the context of the patents, a *wired* transceiver makes no sense, especially because the Asserted Patents do not disclose any 'means for downloading' using a transceiver other than wirelessly" (Dkt. #42 at p. 8 (footnote omitted)).

Defendant responds that neither the specification nor any dictionary or treatise limits the meaning of "transceiver" to only wireless communications (Dkt. #43 at p. 10).

Plaintiff replies: "The term transceiver appears only in dependent [C]laims 21–24 of the '907 Patent relating to the 'means for downloading' recited in claim 1. In that context, the transceiver must be *wireless* because the claims are restricted to the structure disclosed in the specification and equivalents, and all the transceivers described in the specification download information *wirelessly*." (Dkt. #49 at p. 2 (footnotes omitted)).

### 2. Analysis

Plaintiff has not identified any intrinsic definition or disclaimer that would warrant limiting the term "transceiver" to wireless communication. The disclosures cited by Plaintiff are unavailing in this regard. *See* '907 Patent at 4:26–31, 4:47–55, 7:7–11, 7:43–48, 8:14–18, 8:66–9:4, 9:9–14. These disclosures of wireless communications relate to specific features of preferred embodiments rather than to the meaning of "transceiver" or to the claimed invention as a whole.

The specification refers to information being retrieved by authorities "remotely and/or at the scene of a vehicle theft or vandalism." *Id.* at 7:29–30. Although the phrase "at the scene" does not preclude using wireless communications, this disclosure is nonetheless consistent with the possibility of using wired communications because information retrieval is not necessarily "remote." Further, an extrinsic technical dictionary definition submitted by Plaintiff states that

"transceivers" are used on local area networks ("LANs"), and this definition does not indicate that the LAN must be a wireless LAN rather than a wired LAN (Dkt. #42, Exhibit D at 527 (EVIC_006827) (defining "transceiver" as a "device that can both transmit and receive signals. On LANs (local area networks), a transceiver is the device that connects a computer to the network and that converts signals to and from parallel and serial form.")).

Finally, at the claim construction hearing, Plaintiff emphasized dependent Claims 22, 24, and 25 of the '907 Patent. In particular, dependent Claim 22 recites: "The system of claim 21 wherein said transceiver down loads said video signal in real time." '907 Patent at 11:51–52. Plaintiff argued that "real time" communication must be wireless. However, assuming for the sake of argument this is true, dependent claims add limitations to the claim from which they depend. To whatever extent "real time" requires wireless communication, any such requirement is a limitation of the dependent claim and is not necessarily a limitation of the independent claim.

The Court therefore expressly rejects Plaintiff's proposed construction. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

The Court accordingly construes **"transceiver"** to have its **plain meaning**.

**D. "access code" / "authorization code"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| plain and ordinary meaning | A code that (1) identifies a particular authorized person and (2) must be entered to view, download, or alter data already stored on a device (the data is inaccessible without entry of the access code); provided, however, an (3) access code is not used to activate or operate a device or system and (4) an access code is not a decryption key. |

(Dkt. #37, Exhibit B at p. 4; Dkt. #47, Exhibit A at p. 14). The parties submit that these terms appear in Claim 26 of the '907 Patent and Claims 1, 18, and 35 of the '013 Patent (Dkt. #37, Exhibit B at p. 4).

### 1. The Parties' Positions

Plaintiff argues that "[n]either the claims nor the specification require that the term 'access code' be tied to particular functions; accordingly, the Court should adopt the plain meaning" (Dkt. #42 at p. 8). Plaintiff also argues that Defendant's proposed construction improperly imports limitations in the absence of any definition or disavowal (Dkt. #42 at pp. 9–11).

Defendant responds that both of the patents-in-suit explain that access codes are used to prevent unauthorized viewing, downloading, or altering of data (Dkt. #43 at pp. 11–12). Defendant also argues that intrinsic evidence regarding evidentiary "chain of title" demonstrates that an access code must identify a specific person (Dkt. #43 at pp. 12–13). Further, Defendant urges the patentee explained during prosecution that the "access code" was not a login or a password for activating a system (Dkt. #43 at p. 14). Finally, Defendant argues that during prosecution the patentee argued that an "access code" was not a decryption key (Dkt. #43 at p. 15).

Plaintiff replies that Defendant's proposal "renders surrounding claim language superfluous in some claims and imports a limitation into other claims where it does not belong" (Dkt. #49 at p. 3). Plaintiff also argues that Defendant's proposal "excludes preferred embodiments that permit viewing and downloading of stored data without entry of a code identifying a particular authorized person—such as automated computer-to-computer downloads in real time, on a schedule, or upon occurrence of a predetermined event" (Dkt. #49 at p. 3).

### 2. Analysis

Surrounding claim language sufficiently explains the meaning of the disputed terms. For example, Claim 1 of the '013 Patent recites, in relevant part, "[A]n interface permitting input of an *authorization code* for accessing said data captured by said recording device, the captured data being inaccessible without the *authorization code* thereby securely maintaining the captured data as evidence of the incident . . . ." '013 Patent at 13:40–45.

As to whether an "access code" or "authorization code" must identify a specific person, the specification refers to restricting access to a group of people, namely "law enforcement and/or other authorized persons." '907 Patent at 3:25–26. Claim 26 of the '907 Patent recites that the videos are stored "on a secure large capacity, code accessible device," which is accessed "by means of the access code." Such access to a particular device could be analogous to using a physical key (or perhaps entering a number key combination) to open a door or a vault, wherein use of a particular key is not necessarily person-specific. The specification contains no clear indication that "access" or "authorization" must be associated with a specific person.

Further, the prosecution history cited by Defendant contains no definitive statements in this regard as to the disputed terms. *See* Dkt. #43, Exhibit 6 at 16 (WatchGuard_PA-002644). Although the patentee stated "the code is used to access the information and to authenticate the

receiving party," a reasonable interpretation of this prosecution history is permission must be authenticated, not necessarily identity (Dkt. #43, Exhibit 6, at 15 (WatchGuard_PA-002643); Dkt. #43, Exhibit 7 at 11 (WatchGuard_PA-002496)). *See Omega Eng'g*, 334 F.3d at 1324 (emphasis added) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution."); *see also Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1332 (Fed. Cir. 2004) ("Because the statements in the prosecution history are subject to multiple reasonable interpretations, they do not constitute a clear and unmistakable departure from the ordinary meaning of the term . . . ."). Even though the specification refers to "chain of title," any legal significance that might be attributed to that term is not relevant in the context of the patents-in-suit, particularly because "chain of title" appears to be an erroneous reference to chain of custody. *See* '907 Patent at 4:21–26; '013 Patent at 1:49–52; *id.* at 6:37-40 (using chain of obtained evidence similarly).

As to Defendant's proposal of "view, download, or alter," this proposed limitation is unnecessary in light of (and perhaps inconsistent with) surrounding claim language that explicitly identifies the activity with which the "access code" and "authorization code" are associated, namely access. Likewise, Defendant has not adequately justified its proposed parenthetical that "the data is inaccessible without entry of the access code" (Dkt. #47, Exhibit A at p. 14).

As to Defendant's proposal that "an access code is not used to activate or operate a device," during prosecution the patentee distinguished prior art as preventing unauthorized activation rather than unauthorized access. *See* Dkt. #43, Exhibit 18 at 5 (WatchGuard_PA002468) ("Bellman teaches unauthorized activation of the system, whereas

Applicant claims prevention of unauthorized access to the recorded information-two entirely different concepts.")).

Assuming Defendant has demonstrated that an access code must be different from something that merely activates a system, Defendant has not shown that an access code cannot *also* be used to activate a system. Likewise, Defendant has not demonstrated that an access code cannot also be used to decrypt data. The Court therefore rejects Defendant's proposal to exclude such functionality.

The Court thus expressly rejects Defendant's proposed construction. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Summit 6*, 802 F.3d at 1291.

Accordingly, the Court construes **"access code"** and **"authorization code"** to have their **plain meaning**.

### E. "code accessible device" / "coded access recording device"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| plain and ordinary meaning | A device that requires entry of an access code to access data stored on the device.[3] |

(Dkt. #37, Exhibit B at p. 12; Dkt. #43 at p. 15; Dkt. #47, Exhibit A at p. 17). The parties submit that these terms appear in Claims 1, 24, 26, and 43–44 of the '907 Patent (Dkt. #37, Exhibit B at p. 12).

### 1. The Parties' Positions

Plaintiff argues: "As is clear from the claim language, the 'code accessible device' is a device that may be accessed with an access code. This phrase requires no further construction."

---

[3] Defendant previously proposed: "A device that *has been adapted to* require entry of an access code to access data stored on the device." (Dkt. #37, Exhibit B at p. 12 (emphasis added)).

(Dkt. #42 at p. 10). Plaintiff also argues that "[Defendant's] construction rearranges the words of the term and imposes new functional limitations on a structural claim element" (Dkt. #42 at p. 10 (footnote omitted)).

Defendant responds that there is no disclosure to support Plaintiff's suggestion that a "code accessible device" may sometimes not require an access code (Dkt. #43 at pp. 15–16).

Plaintiff replies that Defendant's proposal "adds nothing to the plain language" and "improperly renders surrounding claim language superfluous" (Dkt. #49 at p. 5).

### 2. Analysis

The independent claims here at issue are Claims 1 and 26 of the '907 Patent. Claim 1(c) recites "a code for providing coded access to said recording device." '907 Patent at 10:58–59. Claim 26 further recites "accessing the stored video signal by means of an access code." *Id.* at 12:6–7. Defendant's proposed construction is redundant and unnecessary.

The Court therefore expressly rejects Defendant's proposed construction. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Summit 6*, 802 F.3d at 1291.

The Court accordingly construes **"code accessible device"** and **"coded access recording device"** to have their **plain meaning**.

### F. **"video signals having coded access"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| plain and ordinary meaning<br><br>Alternatively:<br>    "video signals stored on a code accessible device" | video signals that are encrypted and stored on a code accessible device |

(Dkt. #37, Exhibit B at p. 14; Dkt. #42 at p. 13; Dkt. #47, Exhibit A at p. 18). The parties submit that this term appears in Claim 1 of the '907 Patent (Dkt. #37, Exhibit B at p. 14).

### 1. The Parties' Positions

Plaintiff argues that "[r]eading the claim language in light of the specification, the recording device has coded access—not the video signals," and "[e]ncryption is only one preferred type of encoding that may be used" (Dkt. #42 at p. 12 (footnotes omitted)).

Defendant responds that the only disclosed manner of securely storing video signals is encryption. (Dkt. #43 at p. 16). Defendant likewise submits that there is no disclosure of storing video signals anywhere other than on a code accessible device (Dkt. #43 at p. 17).

Plaintiff replies by reiterating its opening arguments (Dkt. #49 at p. 5).

### 2. Analysis

Claim 1 of the '907 Patent recites:

**1.** An on board secure vehicle mounted surveillance system comprising:
   a) at least one video camera monitoring the interior and the exterior of the vehicle and for generating video signals of an incident proximate the vehicle;
   b) *a recording device for capturing and securely storing said video signals having a coded access;*
   c) a code for providing coded access to said recording device;
   d) means for down loading said video signal from said coded access recording device.

'907 Patent at 10:51–61 (emphasis added).

Read in context, "coded access" in the disputed term refers to the manner that video signals are stored rather than the video signals themselves. Of particular note, Claim 1(d) refers to "said video signal from said coded access recording *device*" rather than coded video signals. The Court therefore rejects Defendant's proposal that the video signals must be encrypted. To the extent that the specification discloses encrypted video signals (see, for example,'907 Patent at 4:18–21, 7:25), such encryption is a specific feature of particular disclosed embodiments that

should not be imported into the claims.  *See Constant*, 848 F.2d at 1571; *see also Phillips*, 415 F.3d at 1323.

The Court expressly rejects Defendant's proposal that the video signals are "encrypted" and adopts the substantial agreement between the parties, evidenced by comparing Plaintiff's alternative proposal with the remainder of Defendant's proposed construction.

The Court therefore construes **"video signals having coded access"** to mean **"video signals stored on a code accessible device."**

### G. "transfer device"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| plain and ordinary meaning<br><br>OR<br><br>a device capable of accessing, receiving, or downloading information | A device used for gathering data comprising (1) a portable computer system having information input means for entering commands and information used in accessing and communicating with a remote recording system, (2) a transceiver for receiving, downloading, and transmitting information from the remote recording system; (3) a temporary information storage and compression means for storing information downloaded from a recording system. |

(Dkt. #37, Exhibit B at p. 27; Dkt. #47, Exhibit A at p. 19).  The parties submit that this term appears in Claims 1, 18, 35, and 52 of the '013 Patent (Dkt. #37, Exhibit B at p. 27).

### 1.  The Parties' Positions

Plaintiff argues that Defendant's proposal improperly limits this disputed term to a single disclosed embodiment (Dkt. #42 at p. 14).  In particular, Plaintiff argues that Defendant relies upon disclosures that refer to the "present invention" or the "instant invention," whereas "other portions of the intrinsic evidence support a broader construction" (Dkt. #42 at p. 14).

Defendant responds that the specification expressly defines the disputed term (Dkt. #43 at p. 18). Defendant also argues that Plaintiff's proposal is overbroad because it would encompass any device that can send or receive information (Dkt. #43 at p. 20).

Plaintiff replies, "The '013 patent uses the terms 'transfer device' and 'downloading device' interchangeably." (Dkt. #49 at p. 6). Plaintiff urges that Defendant's proposal to limit the "transfer device" to a single embodiment improperly excludes the "download device" of Figures 1 and 2 (Dkt. #49 at p. 6).[4]

**2. Analysis**

"Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *accord CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

The specification discloses:

> The remote information access and transfer device used to gather data in accordance with the instant invention, comprises a portable computer system having information input means for entering commands and information used in accessing and communicating with a remote recording system; and a transceiver for receiving, downloading, and transmitting information from a Recording System. *In one embodiment*, the device further comprises a visual display for viewing information downloaded from a Recording System.
>
> The transfer device further comprises temporary information storage and compressing means for storing information downloaded from a Recording System.

---

[4] Plaintiff has also cited testimony by named inventor Robert Scaman (Dkt. #49, Exhibit AA at 217:18–218:7 ("A transfer device and a download device I believe refer to the same thing.")). Such testimony, however, does not significantly affect the Court's analysis in this case. *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346–47 (Fed. Cir. 2008) (noting that inventor testimony is "limited by the fact that an inventor understands the invention but may not understand the claims, which are typically drafted by the attorney prosecuting the patent application"). Likewise, Plaintiff has cited a comment from Defendant's counsel at Robert Scaman's deposition (Dkt. #49, Exhibit AA at 218:7 ("Okay. That was always my understanding too.")). Plaintiff's reliance upon the comment of Defendant's counsel is unpersuasive because the comment does not rise to the level of a stipulation.

'013 Patent at 7:13–25 (emphasis added). This disclosure, which refers to "the instant invention," does not use reference numerals (so as to refer to a specific illustrated embodiment) and does not otherwise indicate that it is limited to a particular embodiment. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."). Also, the above-quoted passage expressly states when a particular limitation applies to merely "one embodiment."

Plaintiff has cited disclosures of specific embodiments that include some of the features set forth in the above-disclosed lexicography as well as others, but such disclosures do undermine the patentee's explicit definition. *See* '013 Patent at 4:26–29, 4:49–52, 8:15–18, 7:25-33, 10:22–25, 10:38–43. Further, Plaintiff has not persuasively shown that the '013 Patent uses the terms "transfer device" and "download device" interchangeably. '013 Patent at 1:31–35, 4:9–67.

At the claim construction hearing, Plaintiff emphasized *Hill-Rom Services, Inc. v. Stryker Corp.*, which found the phrase "in accordance with the present invention" referred to a particular embodiment. 755 F.3d 1367, 1377 (Fed. Cir. 2014). However, *Hill-Rom* is readily distinguishable because the sentence at issue in *Hill-Rom* began with "In one embodiment of the invention" and concluded with the "in accordance" phrase. *Id.*

The Court therefore construes **"transfer device"** to mean **"device used for gathering data comprising (1) a portable computer system having information input means for entering commands and information used in accessing and communicating with a remote recording system, (2) a transceiver for receiving, downloading, and transmitting**

information from the remote recording system; and (3) a temporary information storage and compression means for storing information downloaded from a recording system."

H. "download trigger"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not indefinite; plain and ordinary meaning | Fails to comply with 35 USC § 112, 1st and 2nd paragraph<br><br>Alternatively, a computer program that causes data to begin downloading.[5] |

(Dkt. #37, Exhibit B at p. 16; Dkt. #43 at p. 24; Dkt. #47, Exhibit A at p. 26). The parties submit that this term appears in Claims 10–13 and 27–29 of the '013 Patent (Dkt. #37, Exhibit B at p. 16).

### 1. The Parties' Positions

Plaintiff submits that "[t]he 'download trigger' initiates downloading" (Dkt. #42 at p. 16).

Defendant responds that the term is indefinite because the claims place no limit on the nature, type of events, or instructions that may trigger downloading (Dkt. #43 at p. 24).

Plaintiff replies that "the '013 Patent discloses numerous examples for triggering a download of data and fully enables the scope of the claims" (Dkt. #49 at pp. 8–9).

At the claim construction hearing, Defendant argued that "download trigger" is used as a substitute for "means."

### 2. Analysis

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir.

---

[5] Defendant previously proposed: "Indefinite, not distinctly claimed, not described, and not enabled. Does not comply with § 112, 1st or 2nd paragraph. Alternatively, a computer program that causes data to begin downloading. See objections regarding clauses governed by Section 112(6), having inadequate structure." (Dkt. #37, Exhibit B at p. 16).

2015) (internal quotation marks omitted). "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (internal quotation marks and citation omitted).

In an en banc portion of the decision, *Williamson* abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment. *Id.* (citation omitted). *Williamson* also abrogated prior statements that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citation omitted). As an alternative, *Williamson* decided to apply the presumption as it had done prior to *Lighting World*. *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)). In a subsequent part of the decision not considered en banc, *Williamson* affirmed the district court's finding that the term "distributed learning control module" was a means-plus-function term that was indefinite due to a lack of corresponding structure, and in doing so *Williamson* stated that "'module' is a well-known nonce word." *Id.* at 1350.

Here, "download trigger" is not a "nonce word" but connotes a class of structures. *See* '013 Patent at 6:49–53, 7:44–49, 10:44–60; *see also* Dkt. #43, Exhibit 13 at 530 (WatchGuard_CC-000012); Dkt. #43, Exhibit 20 at 928 (WatchGuard_CC-000049) ("defining trigger" as "[a] mechanism that initiates an action when an event occurs such as reaching a certain time or date or upon receiving some type of input. A trigger generally causes a program routine to be executed.").

As directed by *Williamson*, this Court applies long-standing principles articulated prior to the *Lighting World* decision. *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) (stating "when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply"); *Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003) ("While we do not find it necessary to hold that the term 'circuit' by itself always connotes sufficient structure, the term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art."); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Even though the term 'detector' does not specifically evoke a particular structure, it does convey to one knowledgeable in the art a variety of structures known as 'detectors.' We therefore conclude that the term 'detector' is a sufficiently definite structural term to preclude the application of § 112, ¶ 6."); *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) (finding that "detent mechanism" was not a means-plus-function term because it denotes a type of device with a generally understood meaning in the mechanical arts)[6]; *Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1232 (N.D. Cal. 2001) (finding "'computer code' was not a generic term but recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions").

---

[6] *Greenberg*, 91 F.3d at 1583 (defining "detent" as "a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms"); *id.* ("It is true that the term 'detent' does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms such as 'clamp' or 'container.' What is important is not simply that a 'detent' or 'detent mechanism' is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art.")

Finally, "[t]he amount of detail required to be included in claims depends on the particular invention and the prior art." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (internal quotation marks and citation omitted). Here, the relatively simple operation of starting a download does not demand any great detail. In sum, Defendant has failed to rebut the presumption against means-plus-function treatment.

As to Defendant's remaining indefiniteness arguments, "[b]readth is not indefiniteness." *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1583 (Fed. Cir. 1996) (quoting *In re Gardner*, 427 F.2d 786, 788 (C.C.P.A. 1970)). Though the disputed term may be broad, Defendant has not demonstrated that the term is unclear. *See* '013 Patent at 6:49–53 ("The information can be downloaded from the Recording System in a variety of ways, including instantaneously, at various set intervals, in response to certain events, and/or in response to remote commands."); *id.* at 7:44–49 ("The device is triggered to download and transmit information from a Recording System in a variety of ways, such as, for example, on a real time basis, based on preset commands, based upon the occurrence of a predetermined event, and/or in accordance with transmitted instructions or commands."); *id.* at 10:44–60 ("[T]he download device **10** is activated to retrieve the vehicle information by a command entered via the keyboard **50** or alternatively, as a result of a transmission trigger from a Recording System **51**. The occurrence of a predetermined event or series of events or even the failure of the occurrence of an event or series of events may trigger the downloading transmission.").

Defendant also makes two patent validity arguments, asserting lack of enablement and lack of written description (Dkt. #43 at pp. 25–27). Such arguments are not proper during claim construction proceedings. *See Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.")

The Court therefore expressly rejects Defendant's indefiniteness argument. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Summit 6*, 802 F.3d at 1291.

The Court accordingly construes **"download trigger"** to have its **plain meaning**.

## I. "integrated, indexed database"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| plain and ordinary meaning<br><br>Alternative[l]y: a database that stores and integrates data in a manner that facilitates searching. | A database in which the different kinds of data, including video, audio, and text is stored.[7]<br><br>Alternatively:<br>   "a database in which all the data captured from the vehicle surveillance system is consolidated into a single file" |

(Dkt. #37, Exhibit B at p. 20; Dkt. #42 at p. 18; Dkt. #43 at p. 20; Dkt. #47, Exhibit A at p. 23). The parties submit that this term appears in Claims 1, 16–18, 33–35, and 50–52 of the '013 Patent (Dkt. #37, Exhibit B at p. 20).

### 1. The Parties' Positions

Plaintiff argues that Defendant "attempts to import embodiments from the specification," and "[n]o basis exists for requiring the claimed database to integrate each of video, audio, and text data into a single database" (Dkt. #42 at pp. 18–19).

Defendant responds that "[t]he '013 Patent teaches away from a distributed database" (Dkt. #43 at p. 21).

---

[7] Defendant previously proposed: "A single database that stores and integrates different types of data, including video, audio, and text in a manner that facilitates searching. Alternatively, indefinite, not distinctly claimed, not described, and not enabled. Does not comply with § 112, 1st or 2nd paragraph." (Dkt. #37, Exhibit B at p. 20).

Plaintiff replies that "although video and audio optionally *may* be included in the claimed database, the specification consistently describes the database in broader terms as storing 'information' or 'data'" (Dkt. #49 at p. 7).

At the claim construction hearing, Defendant conceded that the database could contain only video instead of video, audio, and text. Defendant nonetheless maintained that "integrated" means "not distributed" and presented the following alternative proposed construction: "a database in which all the data captured from the vehicle surveillance system is consolidated into a single file."

## 2. Analysis

As a threshold matter, Plaintiff argued at the claim construction hearing that the "database" could simply be an index, analogous to a library card catalog, and need not itself contain the actual surveillance data. This argument does not appear in Plaintiff's briefing (Dkt. #42 at pp. 18–19; Dkt. #49 at p. 7). Even if considered, Plaintiff did not persuasively support its oral argument in this regard. The Court therefore expressly rejects Plaintiff's suggestion that the "database" could be an index and not contain relevant data.

The technical dictionary definitions of "distributed database" submitted by Defendant do not demonstrate that "integrated" necessarily requires a single file. *See, e.g.*, Dkt. #43, Exhibit 15). Defendant also has not demonstrated that the '013 Patent contrasts an "integrated" database with a "distributed" database. Indeed, Defendant has not identified any disclosure regarding "distributed" computing or distributed database technology. Plaintiff's citations of disclosures regarding "the files" or "the entire file" are unpersuasive. *See* '013 Patent at 5:63–67, 11:28–30. Further, Defendant has not adequately shown how the recital in Claim 69 of an "indexed

database" (rather than an "integrated, indexed database") demonstrates that the word "integrated" imparts the meaning that Defendant proposes.

The Court therefore expressly rejects Defendant's proposed construction. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Summit 6*, 802 F.3d at 1291.

The Court accordingly construes **"integrated, indexed database"** to have its **plain meaning**.

### J. "permanent, secure, tamperproof storage facility . . . for permanently storing an indexed database"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not indefinite; plain and ordinary meaning | A database of encrypted information that is permanently preserved on a device that is inaccessible without an access code.<br><br>Alternatively, indefinite.[8] |

(Dkt. #37, Exhibit B at p. 24; Dkt. #43 at p. 27; Dkt. #47, Exhibit A at p. 28). The parties submit that this term appears in Claims 18 and 52 of the '013 Patent (Dkt. #37, Exhibit B at p. 24).

### 1. The Parties' Positions

Plaintiff argues that no construction is necessary because "[t]he terms 'permanent,' 'secure,' and 'tamperproof' are common and would be sufficiently clear to persons of ordinary skill in the art" (Dkt. #42 at p. 19). Plaintiff also argues that Defendant's proposal imports embodiments from the specification because "encryption is only one way of protecting the data—the patents also disclose firewalls and access codes," and "the specification provides

---

[8] Defendant previously proposed: "Indefinite, not distinctly claimed, not described, not enabled. Does not comply with § 112, 1st or 2nd paragraph. Alternatively, [i]n the event the court provides a construction[:] A database of encrypted information that is permanently preserved on a device that is physically inaccessible and may only be accessed electronically using an access code." (Dkt. #37, Exhibit B at p. 24).

examples of physical and electronic inaccessibility (*e.g.*, firewalls, encryption, or access codes) as distinct embodiments" (Dkt. #42 at p. 20).

Defendant responds that "storage facility" refers to a computer storage device rather than a physical building (Dkt. #43 at p. 27).  Defendant also argues that "secure" and "tamperproof" are unclear because nothing can be truly "tamperproof" and because the specification sets forth no standard for measuring whether something is sufficiently "secure" (Dkt. #43 at p. 29). Nonetheless, Defendant submits that the specification teaches that, at a minimum, encryption is necessary to prevent tampering (Dkt. #43 at p. 30).  Further, Defendant urges that "permanent" must be given its ordinary meaning of lasting indefinitely, without change (Dkt. #43 at p. 31). Finally, Defendant argues that an access code is required because preventing unauthorized access is what purportedly distinguishes the invention from prior art (Dkt. #43 at p. 32).

Plaintiff replies, "The parties agree that the 'storage facility' is a computer storage device, such as a server."  (Dkt. #49 at p. 9).  Plaintiff urges that "secure," "tamper proof," and "permanent" are readily understandable in the context of the specification, and "[Defendant's] construction is incorrect because it rephrases terms and imports embodiments" (Dkt. #49 at p. 9).

The parties presented no oral argument regarding this term at the claim construction hearing.

### 2.  Analysis

Defendant has not shown any intrinsic or extrinsic evidence that limits the disputed term to a particular type of "facility" or a particular type of storage, such as requiring an encryption or an access code.  For example, data could be secured by physical mechanisms or by a firewall rather than by encryption.  *See* '013 Patent at 4:3–8, 5:63–65.  Although the specification refers to using encryption (see, for example, '013 Patent at 7:6–8, 8:3–7), this is a specific feature of

disclosed embodiments that should not be imported into the claims. *See Constant*, 848 F.2d at 1571; *see also Phillips*, 415 F.3d at 1323.

Also, Plaintiff submitted a technical dictionary definition to demonstrate the word "permanent" has a well-known meaning in the relevant art (Dkt. #42, Exhibit F at 398 (defining "permanent storage" as "[a] recording medium that retains the data recorded on it for long periods of time without power")). Thus, no special construction of "permanent" is necessary.

Although Defendant argues that nothing can be truly "tamperproof," that word is reasonably understandable in common usage. As a result, the specification sets forth sufficient context such that the disputed term is not impermissibly "subjective." *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

The Court therefore expressly rejects Defendant's proposed construction. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Summit 6*, 802 F.3d at 1291. The Court also expressly rejects Defendant's indefiniteness argument.

The Court accordingly construes **"permanent, secure, tamperproof storage facility . . . for permanently storing an indexed database"** to have its **plain meaning**.

### K. "crash proof, explosion proof repository"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not indefinite; plain and ordinary meaning<br><br>OR<br><br>a repository that is resistant to the damaging effects of a crash or explosion<br><br>Alternatively:<br>    "a repository that is resistant to the damaging effects of a vehicle crash or explosion" | Fails to comply with 35 USC § 112, 1st and 2nd paragraph[9] |

(Dkt. #37, Exhibit B at p. 28; Dkt. #42 at p. 22; Dkt. #47, Exhibit A at p. 31). The parties submit that this term appears in Claims 19 and 41 of the '907 Patent (Dkt. #37, Exhibit B at p. 28).

#### 1. The Parties' Positions

Plaintiff argues that the specification refers to the repository in the context of a vehicle, and therefore "the 'crash proof, explosion proof repository' is designed to survive a vehicle crash or explosion" (Dkt. #42 at p. 21).

Defendant responds that these are not terms of degree, and nothing is truly "crash proof" or "explosion proof" (Dkt. #43 at p. 33). Alternatively, Defendant argues that even if these are deemed to be terms of degree, the specification fails to disclose any objective guidelines (Dkt. #43 at pp. 33–34).

Plaintiff replies by relying upon its opening brief (Dkt. #49 at p. 10).

The parties presented no oral argument regarding this term at the claim construction hearing.

---

[9] Defendant previously proposed: "Indefinite, not distinctly claimed, not described, and not enabled. Does not comply with § 112, 1st or 2nd paragraph." (Dkt. #37, Exhibit B at p. 28).

### 2. Analysis

Although the disputed term does not specify the precise circumstances of a crash or explosion that must be resisted, the context set forth by the specification is sufficiently clear that the repository must be reasonably resistant to a foreseeable vehicular crash. *See Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1382 (Fed. Cir. 2015) ("'[T]he degree of precision necessary for adequate claims is a function of the nature of the subject matter.'" (quoting *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993))). The prosecution history is consistent with such a reading. *See* Dkt. #43, Exhibit K at 7 (EVIC_004481) (arguing that the prior art references did not disclose a device that could "withstand a crash").

Defendant's lack of enablement argument is not proper during claim construction proceedings. *See Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.")

The Court therefore construes **"crash proof, explosion proof repository"** to mean **"a repository that is resistant to the damaging effects of a vehicle crash or explosion."**

### L. "large capacity"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not indefinite; plain and ordinary meaning<br><br>Alternatively:<br>  "recording device with at least 8.6 GB of memory" | Indefinite, not distinctly claimed, not described, not enabled. Does not comply with § 112, 1st or 2nd paragraph.[10] |

---

[10] Defendant previously proposed: "Fails to comply with 35 USC § 112, 1st and 2nd Paragraph." (Dkt. #43 at p. 32).

(Dkt. #37, Exhibit B at p. 30; Dkt. #42 at p. 23; Dkt #43 at p. 32; Dkt. #47, Exhibit A at p. 30). The parties submit that this term appears in Claims 26 and 28 of the '907 Patent and Claim 35 of the '013 Patent (Dkt. #37, Exhibit B at p. 30).

### 1. The Parties' Positions

Plaintiff argues that the specification provides an objective standard for measuring "large capacity" because "a 'large capacity' recording device, as used in the '907 Patent claims and specification, is a hard drive with at least 8.6 GB of memory" (Dkt. #42 at pp. 22–23).

Defendant responds that "large capacity" is a term of degree, and the specification contains no objective guidelines (Dkt. #43 at p. 32).

Plaintiff replies by relying upon its opening brief (Dkt. #49 at p. 10).

The parties presented no oral argument regarding this term at the claim construction hearing.

### 2. Analysis

The specification discloses:

The video signals generated by the video camera **12** are converted to digital format and synchronized, as explained below, and stored on hard drive **34** mounted in a sealed vault or repository somewhere on the vehicle (not shown). A video monitor can be connected to video camera **12** by means of a video online link **40**, to display the scene or incident currently being photographed by the video camera **12** through a monitor and/or transmit the image to an off vehicle site through transceiver **39**.

The hard disk storage is preferred for large capacity. Any configured hard disk device can be used for example, a Seagate UDMA 8.6 GB hard drive. Additionally tape drive storage can be used either as primary or backup. The storage medium can be analog or digital. For example, an endless tape loop or other storage medium could be used. Video storage can be VCR type with endless loop characteristics, re-writeable CD ROM, computer hard drive with computer compression of video. This allows upgrading as new storage media types are produced.

The hard drive **34** which has the capacity to store the information for 48 hours or more, records the digitized, encrypted output of the video camera **12**.

'907 Patent at 7:4–25; *see id.* at 6:26–29 ("The digitized data is stored on a solid state storage means, preferably a large capacity hard drive, which prevents data from being overwritten for very extended periods of time.").

This disclosure of hard disk storage as being "large capacity" provides a sufficient objective reference point for a person of ordinary skill in the art to understand the general contours of "large" in this context. *See Biosig*, 783 F.3d at 1382 ("'[T]he degree of precision necessary for adequate claims is a function of the nature of the subject matter.'" (quoting *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993))).

Defendant urges the Court to construe the disputed term such that "large" has an upper boundary defined by what would have been "large" at the time of the invention. Plaintiff, by contrast, proposes that "large" means greater than 8.6 Gigabytes. Naturally, data storage technology has evolved since the time of the invention. Defendant alternatively proposes that the disputed term should be construed to be a hard disk (Dkt. #43 at p. 33 n.112).

Defendant's proposal of defining an upper boundary, however, runs counter to the context of the specification, which discloses that the storage should be "large" so as to accommodate, for example, data representing "48 hours *or more*." '907 Patent at 7:23 (emphasis added). Defendant has not identified any basis for setting an upper boundary on how large is "large." Indeed, the specification provides no indication of some larger category of capacity, such as "extra large." Accordingly, the term "large" is sufficiently clear from the context of the claims as referring to storage capacity that is at least large enough to be useful for storing surveillance video. Further, Defendant's proposal for requiring a hard drive is likewise rejected as improperly importing a specific feature from a particular disclosed embodiment. *See Constant*, 848 F.2d at 1571; *see also Phillips*, 415 F.3d at 1323.

The Court therefore expressly rejects Defendant's indefiniteness argument and finds no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Summit 6*, 802 F.3d at 1291.

The Court therefore construes **"large capacity"** to have its **plain meaning**.

## M. "prevent said data from being overwritten for extended periods of time"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not indefinite; plain and ordinary meaning | Fails to comply with 35 USC § 112, 1st and 2nd Paragraph[11] |

(Dkt. #37, Exhibit B at p. 32; Dkt. #43 at p. 34; Dkt. #47, Exhibit A at p. 32). The parties submit that this term appears in Claims 3, 20, 37, and 55 of the '013 Patent (Dkt. #37, Exhibit B at p. 32).

### 1. The Parties' Positions

Plaintiff argues that "the patent provides an example" of being able to "store the information for 48 hours or more" (Dkt. #42 at p. 23 (quoting '013 Patent at 8:42–48)).

Defendant responds that the specification contains no objective guidelines for determining whether a period of time is an "extended" period of time (Dkt. #43 at pp. 34–35).

Plaintiff replies by relying upon its opening brief (Dkt. #49 at p. 10).

The parties presented no oral argument regarding this term at the claim construction hearing.

### 2. Analysis

"When a word of degree is used[,] the district court must determine whether the patent's specification provides some standard for measuring that degree." *Datamize, LLC v. Plumtree*

---

[11] Defendant previously proposed: "Indefinite, not distinctly claimed, not described, not enabled. Does not comply with § 112, 1st or 2nd paragraph." (Dkt. #37, Exhibit B at p. 32).

*Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005) (internal quotation marks and citation omitted), *abrogated on other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).

Claim 3 of the '013 Patent, for example, recites:

**3**. The device of claim 1 wherein said recording device is adapted to prevent said data from being overwritten for extended periods of time.

'013 Patent at 13:60–62.

Plaintiff has referred to a hard drive that has capacity to store "48 hours or more" of output from a video camera. *Id.* at 8:42–46. This disclosure pertains to the amount of data, however, rather than the duration of storage. The claims at issue, such as the claim quoted above, could be interpreted as referring to storage capacity. That is, in a continuously-recording video system, the age of the oldest data would be equal to the capacity of the storage. For example, if the storage capacity is 48 hours, then at any given moment the system would be holding only data from the past 48 hours.

Another plausible interpretation, however, is that once data is stored and recording ceases, the device could prevent the data from being altered for some period of time. Viewed in this manner, Plaintiff's citation of "48 hours or more" is irrelevant. The specification sets forth no guidance regarding what would be an "extended" period of time for purposes of preserving data other than perhaps preserving it long enough to be used as evidence in court proceedings. *See, e.g.*, '013 Patent at 6:37–40. A period of 48 hours presumably would be insufficient in such a context.

The lack of objective criteria for evaluating the meaning of "extended" renders the disputed term indefinite. *See Nautilus*, 134 S. Ct. at 2129 ("[C]laims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the

invention with reasonable certainty."); *see also Datamize*, 417 F.3d at 1350 ("The scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention."). Also, the existence of multiple reasonable interpretations regarding what period of time is extended, as discussed above, further supports the Court's conclusion that the scope of the claim is not "reasonabl[y] certain[]." *Nautilus*, 134 S. Ct. at 2129.

The Court therefore finds that **"prevent said data from being overwritten for extended periods of time"** is **indefinite**.

### N. means for generating an integrated, indexed database" / "generating an integrated, indexed database of said data"

| **"means for generating an integrated, indexed database" ('013 Patent, Claims 1, 18)** ||
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Structure: download device 10, system controller 16, secure storage facility 60, secure data repository 160, and equivalents<br><br>Function: generating an integrated, indexed database | Indefinite, not distinctly claimed, not described, and not enabled. Does not comply with § 112, 1st or 2nd paragraph.[12] |

| **"generating an integrated, indexed database of said data" ('013 Patent, Claim 35)** ||
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Not governed by 35 U.S.C. § 112(6)<br><br>No identification of the structures, acts, or materials required. | Indefinite, not distinctly claimed, not described, and not enabled. Does not comply with § 112, 1st or 2nd paragraph. |

(Dkt. #37, Exhibit C at pp. 1–2; Dkt. #43 at p. 36; Dkt. #47, Exhibit A at pp. 34, 36).

---

[12] Defendant previously proposed: "Indefinite, not distinctly claimed, not described, not enabled. Does not comply with §112, 1st or 2nd paragraph." (Dkt. #37, Exhibit C at pp. 1–2).

### 1. The Parties' Positions

The parties agree that the "means for generating . . ." terms in Claims 1 and 18 of the '013 Patent are means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6. The parties dispute whether the "generating . . ." term in Claim 35 of the '013 Patent is a means-plus-function term.

For the "means for generating . . ." terms, Plaintiff argues that the specification discloses sufficient corresponding structure (Dkt. #42 at p. 25). Plaintiff also argues, "Additionally, to the extent the disclosed structure is considered general purpose computer hardware, the '013 Patent discloses the algorithm for performing the claimed function in at least prose form throughout the specification." (Dkt. #42 at pp. 25–26) (footnote omitted)).

Defendant responds that the "generating . . ." term is a means-plus-function term because the claim uses functional language without reciting any structure (Dkt. #43 at p. 37). Defendant urges that all of these disputed terms are indefinite because of lack of a corresponding structure or algorithm (Dkt. #43 at p. 37).

Plaintiff replies that Defendant has failed to address the structure and algorithms identified by Plaintiff (Dkt. #49 at p. 10). Plaintiff also argues that Defendant has not shown how 35 U.S.C. § 112, ¶ 6 is applicable to the method step at issue in Claim 35 (Dkt. #49 at p. 10).

The parties presented no oral argument regarding this term at the claim construction hearing.

### 2. Analysis

As a threshold matter, "generating an integrated, indexed database of said data" is a method step in Claim 35 of the '013 Patent. Defendant has not argued that this term is written in "step-plus-function" format, so Defendant has not shown how 35 U.S.C. § 112, ¶ 6 could apply.

*See Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002) ("[W]here a method claim does not contain the term 'step[s] for,' a limitation of that claim cannot be construed as a step-plus-function limitation without a showing that the limitation contains no act.").  The Court therefore rejects Defendant's proposal as to the "generating . . ." step in Claim 35.

As to the "means for generating . . ." terms, the specification discloses:

The interface **18** stores the information on the download device **10** by directly communicating with the download device's information storage means **32** via link **36**.  The information storage means **32**, which has the capacity to store the information for 48 hours or more, records the encrypted or unencrypted information accessed by the interface **18**.

. . . .

The download device's information storage means **32** can also communicate with the transceiver **40** via transmitting link **44** so the information can be transmitted, via the transceiver **40**, to a remote location after it is stored on the download device's information storage means **32**.

. . . .

Whether remotely or directly downloaded to secure location **52**, *once the information is received in secure location **52**, it is processed for permanent storage as an integrated, verified, indexed database in secure storage facility **60***.  The data is cataloged, tagged, encrypted, and compressed.  In some cases additional indexes information is layered on the files as previously described.  Transfer is accomplished by secure physical transport for direct data download or by highly secure, tamperproof electronic interface through super firewalls.  The database entries are able of instantaneous access by means of indexing which allows authorities to retrieve information without search of the entire file.  Alternatively, the entire file may be searched.  Tracking of access and software to detect time and date of any chan[ge] is used to assure integrity of the originally recorded data.

. . . .

Once downloaded the information can be verified by use of stored information onboard vehicle **11**, encrypted, indexed and integrated into a secure database for permanent storage in secure storage facility **60**.  Access to secure storage facility **60** is available electronically [by] means of super fire wall **62** or alternately by means of a secure physical download interface **64**.

Turning to **FIG. 4**, there is shown a *system **100** for the integration of the system information into the indexed permanent database housed in the secure data repository **160***.  As shown, numerous links comprise the system **100** information flow network.  Both a satellite network and a ground network with satellite interface are used to facilitate information transmittal in accordance with the instant embodiment.  A satellite network of GPS satellites **156** with links **158** and **154** and a cellular/Internet (WAN/LAN) system **110** with links **105** are

available for data transfer to the off-site location **152**. The information is verified, indexed encoded and integrated into the permanent database housed in the secure data repository **160**.

. . . .

In accordance with the instant invention, information down linked to off-site location **152** is verified re-encrypted, indexed and integrated into a secure database and transferred to secure data repository **160** either electronically through a super fire wall (not shown) or physically by means of secure identification download (not shown). Once in place, the data in the database is a permanent, non-tamperable, information repository for use as evidence regarding environment, facts and circumstances surrounding the recorded incident. The information stored and indexed is available to law enforcement, insurance company and the like through for example, Internet connection **130** or any other available uplink means such as cellular, fiber optic LAN and/or satellite. The database can be searched almost instantaneously and is capable of providing a "chain of title" for evidence contained therein.

'013 Patent at 8:40–46, 9:17–23, 11:19–33, 12:29–35, 13:7–22 (emphasis added); *see id.* at 8:18–39 (describing the system controller 16); *id.* at 3:66–4:2 ("The indexing can include record identification parameters added to the file to facilitate retrieval by authorities."); *id.* at 5:67–6:4 (indexing can be based on "numerous parameters" such as identification, date, location, vehicle information, and others).

These disclosures link two alternative structures to the claimed function: (1) secure location 52 and secure storage facility 60; or (2) system 100 (which includes secure data repository 160, among other illustrated components that are "for the integration of the system information into the indexed permanent database housed in the secure data repository 160." *Id.* at 12:36–48; *see also id.* at 11:19–33.

The Court accordingly finds that **"means for generating an integrated, indexed database"** is a means-plus-function term. The claimed function is **"generating an integrated, indexed database,"** and the corresponding structure is **"(1) secure location 52 and secure storage facility 60, and equivalents thereof; or (2) system 100, and equivalents thereof."**

The Court further finds that **"generating an integrated, indexed database of said data"** is not a means-plus-function term, as discussed above. The Court therefore construes this term to have its **plain meaning**.

### O. "transfer device adapted to securely receive data from said remote vehicle incident recording system [and index said data for storage]"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Not governed by 35 U.S.C. § 112(6)<br><br>No identification of the structures, acts, or materials required | Indefinite, not distinctly claimed, not described, and not enabled. Does not comply with § 112, 1st or 2nd paragraph. |

(Dkt. #37, Exhibit C at p. 4). The parties submit that these terms appear in Claims 1, 18, and 52 of the '013 Patent (Dkt. #37, Exhibit C at p. 4).

Plaintiff argues that the term "transfer device" connotes structure and the "adapted to . . ." language recites configuration, not function (Dkt. #42 at p. 27).

Defendant responds "that the phrase 'transfer device adapted to securely receive data from said remote vehicle incident recording system [and index said data for storage],' as recited in [C]laims 1, 18, and 52 of the '013 Patent is not governed by §112, ¶6" (Dkt. #43 at p. 1 n.1).

Defendant presented no other argument or discussion as to this term, and this term is not presented as a disputed term in the parties' October 4, 2016 Joint Claim Construction Chart. *See* Dkt. #47 at Exhibit A.

Therefore, the Court does not address this term further because it is no longer in dispute.

### P. "wherein said download trigger is adapted to respond to [the occurrence of a predetermined event] / [transmitted instructions]"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not governed by 35 U.S.C. § 112(6)<br><br>No identification of the structures, acts, or materials required | Fails to comply with 35 USC § 112, 1st and 2nd paragraph[13] |

(Dkt. #37, Exhibit C at pp. 5–6; Dkt. #43 at p. 38; Dkt. #47, Exhibit A at pp. 37–38). The parties submit that these terms appear in Claims 10–12, 27–29 of the '013 Patent (Dkt. #37, Exhibit C at pp. 5–6).

### 1. The Parties' Positions

Plaintiff argues that even if the "download trigger" is a computer program, 35 U.S.C. § 112, ¶ 6 still has not been invoked (Dkt. #42 at p. 28).

Defendant responds that these terms are governed by 35 U.S.C. § 112, ¶ 6 because the phrase "download trigger" is merely a substitute for "means for" (Dkt. #43 at p. 39). Defendant argues that the specification sets forth no corresponding algorithm and therefore these terms are indefinite (Dkt. #43 at p. 39).

Plaintiff replies by relying upon its opening brief (Dkt. #49 at p. 10).

### 2. Analysis

For the same reasons discussed above for to the constituent term "download trigger," Defendant has failed to rebut the presumption against means-plus-function treatment for these non-means terms.

---

[13] Defendant previously proposed: "Indefinite, not distinctly claimed, not described, and not enabled. Does not comply with § 112, 1st or 2nd paragraph." (Dkt. #37, Exhibit C at pp. 5–6).

The Court therefore construes **"wherein said download trigger is adapted to respond to [the occurrence of a predetermined event] / [transmitted instructions]"** to have its **plain meaning**.

## CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**IT IS SO ORDERED.**

**SIGNED this 2nd day of November, 2016.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE